UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

JUDGE COTE

08  CV  8437

--------------------------------------x

BANKRUPTCY MANAGEMENT
SOLUTIONS, INC., AND OCWEN
FINANCIAL CORPORATION

               Plaintiffs,

     v.

GOLDMAN SACHS GROUP, INC. and
GOLDMAN SACHS & CO.

             Defendants.

--------------------------------------x

**COMPLAINT**

(Jury Trial Demanded)



RECEIVED
OCT - 2 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Bankruptcy Management Solutions, Inc. ("BMS") and Ocwen Financial

Corporation ("Ocwen"), for their complaint against defendants Goldman Sachs Group Inc. and

Goldman Sachs & Co. (together, "Goldman"), allege as follows:

**PRELIMINARY STATEMENT**

1.     This action for fraud arises out of Goldman's false statements to BMS and Ocwen

aimed at convincing those companies not to liquidate auction rate securities ("ARS") Goldman

had sold them and to induce BMS and Ocwen to continue purchasing those instruments from

Goldman at a time when Goldman knew the market for those securities was collapsing.

2.     ARS are long-term interest-bearing instruments that were traded at periodic

auctions (typically, every 7, 14 or 28 days), where their interest rates were reset and where

investors were supposed to be able easily to liquidate their investments.  Goldman earned

substantial fees as a leading underwriter of student loan auction rate securities ("SLARS"), *i.e.*,

ARS based on student loans typically supported by government guarantees.  Goldman also

earned substantial fees as a leading manager of the auctions through which SLARS were marketed, and as a broker selling SLARS to investors.

3.      At all relevant times, Ocwen, which is 46% owner of BMS, managed investments for both plaintiffs.  Between July 2006 and August 2007, Goldman sold to BMS and Ocwen approximately $3.6 billion of SLARS.  At all times during this period, Goldman represented to BMS and Ocwen that SLARS were appropriate securities for those companies' investment portfolios which, as Goldman knew or consciously and recklessly disregarded, were restricted to safe, highly-liquid investments.  Further, Goldman expressly represented to BMS and Ocwen that in the event there were insufficient third-party purchasers for SLARS Goldman had sold to BMS and Ocwen, Goldman would purchase those securities at par value for its own account, thereby ensuring the liquidity of those instruments and the smooth operation of the auctions. Goldman represented to BMS and Ocwen that it had been acting in such a market making capacity for more than fifteen years and would continue to do so.

4.      In August 2007, unbeknownst to BMS and Ocwen, third-party demand for SLARS evaporated leaving an excess of supply of SLARS being offered for sale.  Because SLARS had always been marketed for their purported safety and liquidity, Goldman and other SLARS brokers knew that any disruption in liquidity for the securities could kill what had been a lucrative market for nearly two decades.  Accordingly, in an effort to preserve their fee generating business at the expense of clients like BMS and Ocwen, Goldman and other SLARS brokers sought to conceal the drop in third-party demand by dramatically -- albeit secretly -- increasing purchases of SLARS for their own accounts, thereby creating and maintaining the illusion of continuing liquidity in the market.  Although this scheme effectively concealed from investors such as BMS and Ocwen the loss of genuine liquidity in the SLARS market, it

2

threatened to overwhelm Goldman's and other brokers' balance sheets with increasingly illiquid and unmarketable securities.

5.     As Goldman and other brokers scrambled to prop up the collapsing SLARS market, they also employed a number of tactics to off-load their holdings of these unwanted securities that threatened to overwhelm their balance sheets.  Among those tactics, brokers artificially inflated the interest rates that issuers of SLARS paid to holders of those securities in the hopes of inducing more third-party investors to purchase the instruments.  Goldman and other brokers artificially inflated interest rates by deliberately submitting high bids at auctions to buy SLARS for their own accounts, which had the effect of driving up interest rates the issuers would pay on all SLARS that sold at such auctions.

6.     Because the inflated rates impacted the securities' risk profile by increasing the financial burden on the issuers, Goldman, as underwriter, was required to have the issuers obtain special waivers from the rating agencies to ensure that, at least temporarily, the inflated interest rates would not cause the agencies to cut the AAA ratings essential for Goldman to market those SLARS to conservative investors such as BMS and Ocwen as safe, secure investments.

7.     Unaware that Goldman and other brokers were deliberately inflating SLARS interest rates, BMS and Ocwen monitored the continuous rise throughout August and September 2007.  Understanding that an increase in interest rate is typically associated with a decrease in credit quality, increase in credit risk and/or a decrease in liquidity, BMS and Ocwen deemed it prudent to determine whether the increase in SLARS interest rates reflected such risks as to the those securities, or whether there were any other issues or concerns relating to SLARS of which they should be aware.  Because Goldman had informed BMS and Ocwen that it was the largest

SLARS underwriter, and because Goldman was the single largest seller of SLARS to BMS and Ocwen, BMS and Ocwen contacted Goldman to discuss the credit and liquidity risks relating to those securities.

8.      In advance of, and during a telephone conference on October 10, 2007, BMS and Ocwen advised Goldman that they had observed a continuing elevation in the interest rates paid by SLARS and wanted to discuss whether those increases reflected a decrease in credit quality, increase in credit risk, and/or decrease in liquidity.  BMS and Ocwen also advised Goldman that they wanted to be informed as to whether there were any other issues relating to SLARS credit or liquidity of which they should be aware.  BMS and Ocwen advised Goldman that the purpose of their inquiry was to gather information with which to determine whether BMS and Ocwen should sell the SLARS they had, hold those securities but not buy any more, or continue holding and buying SLARS as they had to date.

9.      In mid-October 2007 -- the time of BMS's and Ocwen's call with Goldman -- Goldman was engaged in a desperate effort to conceal the disappearance of liquidity from the SLARS market, while at the same time reducing its own SLARS holdings.  If Goldman failed to convince BMS and Ocwen that SLARS remained safe and highly liquid, Goldman would not only lose an investor that had, in the past, and likely would, in the future, purchase billions of dollars of SLARS from Goldman, it would also be faced with having to repurchase from BMS and Ocwen nearly $328 million of SLARS that those companies were holding at that time.

10.      Accordingly, in response to BMS's and Ocwen's direct questions, Goldman expressly represented to BMS and Ocwen in October 2007 that SLARS remained AAA-rated and, accordingly, were as safe as ever, there was no lack of liquidity in the market, and the

higher interest rates BMS and Ocwen were enjoying were the result of investors bidding for the

securities. Further, Goldman sought to provide complete comfort to BMS and Ocwen,

representing once again that Goldman remained committed to making a market in SLARS,

meaning that it would continue to purchase at par value any SLARS it sold to BMS or Ocwen for

which there were not sufficient third-party bids, consistent with its practice over the preceding

fifteen years. Goldman's statements were uniformly false and misleading.

11.    Goldman did not tell BMS and Ocwen the truth which was the exact opposite;

namely, that: liquidity was disappearing for the securities; the high interest rates SLARS were

paying were caused by Goldman's and other brokers' efforts to artificially inflate returns to

induce investors to buy those instruments; and Goldman and other brokers were contemplating

ending their practice of making markets by buying at par value SLARS for which there had been

insufficient third-party bids, which Goldman knew would cause a complete collapse of the

market stranding investors, such as BMS and Ocwen, with illiquid securities. Further, Goldman

did not advise BMS and Ocwen that, although the rating agencies had retained their AAA ratings

on the SLARS, the increased burden on the issuers and potentially greater default risk associated

with the higher interest payments necessitated a waiver from the rating agencies to avoid a cut in

those essential AAA ratings.

12.    In reliance on Goldman's representations and concealments, BMS and Ocwen did

not liquidate the SLARS they had purchased previously from Goldman and cease purchasing

new securities but, rather, continued their ARS transactions with Goldman as before.

Accordingly, in the months that followed, BMS and Ocwen purchased from Goldman millions of

dollars of securities that Goldman had represented as safe, AAA-rated, liquid instruments

benefiting from Goldman's commitment as market maker; at no time did Goldman take steps to

correct its assurances or otherwise alert BMS and Ocwen of the true condition of the ARS

markets as known only to Goldman and other ARS brokers.

13.     On February 13, 2008, after months of secretly contemplating a full retreat from

the ARS market, Goldman stopped buying all ARS, including SLARS.  That same day, other

ARS brokers followed Goldman's lead, ending their decades-long practice of purchasing ARS

for which there were insufficient third-party bids.  As a result, the entire ARS market collapsed,

saddling countless investors with hundreds of billions of dollars of illiquid, long-term

instruments.  At the time of the collapse, BMS and Ocwen held a combined total of Goldman-

brokered SLARS of approximately $236 million.

14.     In June 2008, four months after Goldman and other brokers had caused the

collapse of the SLARS market, Ocwen found itself needing to liquidate at least a portion of the

SLARS in its account to satisfy certain business requirements.  Goldman refused to purchase any

of the SLARS it had sold to BMS and Ocwen unless BMS and Ocwen agreed to accept a

significant discount for the securities.  Having little choice, Ocwen acquiesced to Goldman's

terms and sold Goldman approximately $26 million of the SLARS that Goldman had originally

sold Ocwen, giving Goldman a 5 ½ percent discount to par value -- a nearly two and a half

million dollar boon to Goldman at Ocwen's expense.

15.     In addition to the improper discount Goldman extracted from Ocwen, Goldman's

misrepresentations and omissions have left BMS and Ocwen holding illiquid SLARS with a face

value of approximately $211 million that can be sold only at a material discount.  Notably,

although Goldman had caused the issuers to obtain waivers to preserve the instruments' essential

AAA ratings, such waivers were temporary and the agencies have, in many cases, since

downgraded the ratings applied to SLARS Goldman sold to BMS and Ocwen. These

downgrades, which indicate a decrease in credit quality and increased risk of default, have

further eroded the value and marketability of the SLARS.

16.     As Goldman knew, or consciously and recklessly disregarded, the securities' loss

of liquidity would -- and now has -- caused substantial injury to both BMS and Ocwen. Among

other things, BMS and Ocwen have been compelled to engage in costly restructurings of their

key funding facilities which, although enabling the companies to continue operations, has

materially restricted their earnings capacity. Further, the loss of liquidity and costly restructuring

have derailed BMS's plans to conduct an initial public offering of company shares and other

potential strategic transactions.

## THE PARTIES

17.     BMS is a corporation created and existing under the laws of the State of

Delaware, with its principal place of business in California. BMS provides software, hardware

and support services to assist Chapter 7 bankruptcy trustees by automating administrative tasks

such as tracking, liquidating and managing estates' assets and preparing and distributing

statutorily required notices and mailings.

18.     Ocwen is a corporation created and existing under the laws of the State of Florida,

with its principal place of business in Florida. Ocwen provides loan servicing, mortgage

fulfillment and receivables management services to the financial services industry.

19.     Goldman Sachs Group, Inc., a company created and existing under the laws of the

State of Delaware with its principle place of business in New York, through its wholly owned

subsidiary Goldman, Sachs & Co., a company created and existing under the laws of the State of

New York, with its principle place of business in New York, provides investment banking and securities brokerage services worldwide. Goldman offers, among other things, investment advisory services, underwriting services, brokerage services and asset management, and engages in proprietary trading, and private equity transactions.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1332 and 1367.

21.     Venue is proper in this district pursuant to 15 U.S.C. § 78aa, because the defendants transact business in this district, and pursuant to 28 U.S.C. § 1391, because the defendants reside in this district.

22.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## FACTS

**A.      Ocwen And BMS Limited Their
Investments To Safe, Highly-Liquid Instruments**

23.     Ocwen is a provider of support services to the financial services industry and is 46% owner of BMS, a provider of support services to Chapter 7 bankruptcy trustees. Ocwen manages investments on behalf of itself and BMS.

24.     Pursuant to separate agreements ("Investment Line Agreements"), BMS and Ocwen each had access to investment lines of credit ("Investment Lines") provided by a third-

party financial institution. Although the specific amounts varied over time, BMS typically could draw around $ 1.4 billion from its Investment Line, while Ocwen could draw approximately $1 billion.

25.     The terms governing BMS's and Ocwen's access to their Investment Lines restricted BMS's and Ocwen's investment of the proceeds of those facilities to safe, short-term, highly-liquid instruments such as United States Treasuries and certain corporate obligations. Among the investments expressly permitted under the Investment Line Agreements were U.S. Treasury securities, U.S. Agency securities, certificates of deposit issued by U.S. financial institutions, and ARS based on student loans guaranteed by the U.S. government under the Federal Family Education Loan Program. The terms of the Investment Line Agreements required that all instruments purchased with the facilities' proceeds be liquid within 90 days of purchase.

26.     ARS are long-term interest-bearing instruments that were traded at periodic auctions (typically, every 7, 14 or 28 days), where their interest rates were reset and where investors were supposed to be able easily to liquidate their investments. Accordingly, borrowers issuing ARS were able to obtain long-term financing at lower, short-term interest rates. Brokers marketed ARS as advantageous to investors, representing that ARS were as safe and liquid as money market instruments, but with a slightly higher yield to compensate for the intervals between auctions.

27.     In the event holders of ARS seeking to sell their securities at auction outnumbered investors bidding for those instruments, the auction would be said to "fail," meaning that none of the ARS holders could sell their securities and the instruments would be illiquid until the next

scheduled auction.  In some instances, holders of ARS would receive a higher "penalty rate" of

interest to compensate them for this temporary loss of liquidity.  Although some brokers did

advise investors of the possibility that auctions could fail, brokers routinely advised institutional

and corporate investors that the brokers had, in the past, and would, in the future, step in to

purchase at par value any ARS for which there were insufficient third-party bids, in order to

ensure continuing liquidity and smooth operation of the auctions.

28.    Financial institutions such as Goldman earned fees by playing several different

and conflicting roles in the ARS market.  For example, financial institutions such as Goldman

acted as underwriters of ARS, for which the issuer would pay the institution an underwriting fee.

Thereafter, the same financial institution would typically act as manager of the auctions for the

ARS, for which the institution would also receive a fee.  Finally, the same financial institution

would provide buyers for the ARS it underwrote and managed by marketing those ARS to its

brokerage clients.  The institution would receive brokerage fees from those clients for selling the

ARS to their accounts.

29.    Among the issuers of ARS were: municipalities; closed-end investment funds;

various types of trusts and off-shore entities, including collateralized debt obligations ("CDOs"),

that issued complex credit derivatives; corporations; and providers of student loans.

30.    SLARS were ARS issued by trusts that held pools of student loans that were

normally backed by U.S. government guarantees.  Accordingly, rating agencies typically

conferred AAA ratings on SLARS, enabling brokers -- including Goldman -- to market those

securities to conservative investors as safe, highly liquid instruments.

**B.** **Ocwen And BMS Bought**
**SLARS From Goldman**

31.     In the summer of 2006, Ocwen, on behalf of itself and BMS, contacted Goldman

to inquire as to Goldman's ability to broker investments to BMS and Ocwen that would meet the

criteria set forth in the Investment Line Agreements.  Ocwen advised Goldman of the restrictions

associated with BMS's and Ocwen's Investment Lines, and that it was imperative that the

companies purchase only instruments meeting those guidelines to avoid jeopardizing those

essential sources of funding.  Goldman advised Ocwen that because Goldman was the largest

underwriter of SLARS and manager of auctions for those securities, Goldman could make

available to BMS and Ocwen hundreds of millions of dollars of AAA-rated, short-term, highly-

liquid SLARS that would satisfy the safety and liquidity criteria governing BMS's and Ocwen's

use of proceeds from the Investment Lines.

32.     Goldman advised Ocwen that Goldman ensured liquidity for the SLARS it

underwrote, buying at par for its own inventory SLARS for which there were insufficient third-

party bids to prevent failures and maintain smooth operation of the auctions.  Goldman also

advised Ocwen that because it acted as market maker for the SLARS it sold, Goldman could

provide institutional and corporate investors such as BMS and Ocwen with higher returns by

selling those investors SLARS from Goldman's own inventory at a discount.  Goldman touted

this system as providing the dual benefits of assured liquidity and higher returns for those

investors who purchased SLARS from Goldman.  Notably, Goldman advised Ocwen that under

Goldman's system, there had been only one failed SLARS auction in the prior fifteen years, and

that even in that instance, investors ultimately recovered the value of their holdings.

33.     Based on Goldman's representations, Ocwen began purchasing SLARS for itself and BMS in July 2006.  At all times during which Goldman brokered sales of SLARS to BMS and Ocwen, Goldman touted the safety of those instruments as reflected in their AAA ratings, as well as the reliable short-term liquidity provided by the frequent auctions.  Further, Goldman's conduct continuously reinforced for Ocwen the fact that Goldman would ensure the liquidity of the SLARS by stepping in and buying securities at par for Goldman's own inventory when there were not sufficient bids at auction -- Goldman provided Ocwen with a daily listing of the SLARS Goldman had purchased for its own inventory, which Goldman would then offer to its institutional and corporate clients, including BMS and Ocwen, at a discount.

**C.     Goldman Concealed The Disappearance Of Liquidity From The SLARS Market And Misrepresented Its Commitment To Continue Supporting SLARS Auctions**

34.     In early 2007, mortgage industry data showed increasing defaults among homeowners with subprime mortgages, *i.e.*, loans made to borrowers with troubled credit.  As was reported widely in the following months, banks had packaged trillions of dollars of those mortgages into bonds which were, in turn, repackaged into complex derivative securities, such as CDOs.  Typically, credit rating agencies accorded these complex derivatives high investment grade ratings.  In the spring of 2007, continuing distress in the subprime mortgage market led the rating agencies to begin downgrading complex derivatives such as CDOs, causing their values to plummet.  In early summer 2007, investors sought to sell billions of dollars of these complex derivatives, further driving down their values.

35.     Prior to August 2007, underwriters of ARS tied to CDOs and other complex derivatives had routinely acted as market makers for those instruments, buying for their own inventories CDO-related ARS for which there were not sufficient third-party bids to prevent

failed auctions. As the values of CDOs and other derivatives began to plummet, however, brokers chose to stop supporting auctions for ARS whose value was tied to such instruments to avoid getting stuck with those distressed securities. As a result, beginning August 2, 2007, at least 96 auctions for ARS tied to CDOs and other derivatives failed, leaving institutional and corporate investors stuck with nearly $9 billion of illiquid securities. Because these were private transactions not reported publicly, BMS and Ocwen were not aware of the auction failures and Goldman did not inform BMS or Ocwen of the loss of liquidity for those instruments. Indeed, Goldman deliberately withheld this information.

36.     In the weeks following the August 2007 failures, institutional and corporate investors who had become trapped holding illiquid CDO-related ARS sought to liquidate billions of dollars of other ARS types -- including SLARS -- out of concern that those instruments would also become illiquid. Again, because these were private transactions not publicly reported, BMS and Ocwen were not aware of the sales, and Goldman did not so inform BMS and Ocwen.

37.     The increased flow of SLARS into the auction market significantly outstripped third-party bids for such securities, leaving brokers, including Goldman, to choose between buying ever increasing amounts of those securities for their own inventories, or allowing auctions for those instruments to fail. Because Goldman and other brokers had marketed SLARS to investors as safe and highly-liquid, they knew that failed auctions would likely cause investors to abandon those securities, destroying what had, for two decades, been a lucrative market for the brokers. Accordingly, the brokers, including Goldman, chose to take action to conceal from investors such as BMS and Ocwen the rapid loss of liquidity from the market by increasing purchases of ARS, including SLARS, for their own inventories, thereby saving those auctions from failing. At no time were BMS and Ocwen aware that genuine liquidity for SLARS was

13

disappearing or that the market was becoming increasingly dependent on the brokers'

intervention for liquidity; Goldman did not disclose these facts to BMS or Ocwen.

38.     Although purchasing billions of dollars of SLARS and other ARS at par value

enabled Goldman and other brokers to conceal the distress in those markets, it required the

brokers to use billions of dollars of their increasingly scarce cash to purchase illiquid securities.

To reduce their own burgeoning inventory of unwanted SLARS and recover some of their much

needed cash, brokers, including Goldman, secretly took steps to off-load those securities onto the

retail, institutional and corporate investors from whom they had concealed the disappearing

liquidity in the market.  Among other tactics, Goldman and other brokers sought to induce

investors such as BMS and Ocwen to purchase more SLARS by submitting inflated bids for their

own accounts, thereby artificially driving up the interest rates the issuers of SLARS would pay to

all purchasers, making those securities appear more attractive as investments.

39.     As Goldman knew or consciously and recklessly disregarded, the artificially

inflated interest rates impacted the securities' risk profile by increasing the financial burden on

the issuers.  Notably, as a condition to conferring the AAA ratings used to induce conservative

investors such as BMS and Ocwen to buy SLARS, the rating agencies typically required that

underwriters -- including Goldman -- structure those securities with an interest rate cap to

eliminate the risk that an auction would result in an interest rate so high as to drive the issuer to

default on its obligations.  Because Goldman's and the other brokers' efforts to inflate SLARS

interest rates would violate those caps, the underwriters, including Goldman, sought to have the

issuers obtain special waivers from the rating agencies to ensure that, at least temporarily, the

inflated interest rates would not cause the agencies to cut the AAA ratings essential for

marketing the SLARS as safe, secure investments, to conservative investors such as BMS and
Ocwen.

**D.      Goldman's Express Misrepresentations**
**         And Concealments To BMS And Ocwen**

40.      In or about late September 2007, BMS and Ocwen observed that interest rates
being paid by SLARS offered for sale by Goldman and other brokers had increased significantly
over the prior four weeks. Because an increase in a security's interest rate is typically associated
with a decrease in credit quality, increase in credit risk, and/or a decrease in liquidity, BMS and
Ocwen -- unaware that Goldman and other brokers were artificially causing the inflation of
SLARS interest rates -- determined to inquire whether the SLARS they had been purchasing with
their Investment Lines had become riskier and/or less liquid, and whether they should liquidate
those securities or continue purchasing such instruments for their accounts.

41.      Based on Goldman's representations to BMS and Ocwen that Goldman was the
largest underwriter of SLARS and manager of auctions for those securities, and because
Goldman was the single largest broker of SLARS to BMS and Ocwen, Ocwen, on its own and
BMS's behalf, contacted Goldman in or about mid-September 2007 to arrange a discussion
regarding SLARS. Jeff Neufeld ("Neufeld"), head trader of Ocwen, and William Rinehart
("Rinehart"), Chief Risk Officer of Ocwen, spoke with Frank Murphy ("Murphy") of Goldman
to arrange the discussion.

42.      In the course of scheduling the discussion, Rinehart and Neufeld informed
Murphy that BMS and Ocwen wanted to address with Goldman whether the continuing increase
in SLARS interest rates reflected a decrease in credit quality, increase in credit risk, and/or
decrease in liquidity for those instruments. Further, Rinehart and Neufeld informed Murphy that

BMS and Ocwen wished to discuss more broadly with Goldman whether there were any risks with respect to the SLARS of which BMS and Ocwen should have been aware.

43.     Rinehart and Neufeld also advised Murphy that BMS and Ocwen desired to obtain such information to assess whether SLARS continued to be an appropriate instrument for purchase with the proceeds of BMS's and Ocwen's Investment Lines or whether BMS and Ocwen should liquidate their SLARS holdings.  At the time Neufeld and Rinehart spoke with Murphy in September 2007, BMS and Ocwen held in excess of $396 million of SLARS Goldman had sold the companies.  In total, Goldman had brokered a combined $3.3 billion in SLARS transactions for BMS and Ocwen as of that date.  Murphy agreed that Goldman would arrange a call and make available the necessary personnel to address BMS's and Ocwen's questions.

44.     On October 10, 2007, Neufeld and Rinehart participated in a teleconference ("October Call") with Murphy, and Goldman representatives Sean Smith, Steven Moffitt and Sylvia Yeh.  At the beginning of the call, Rinehart once again advised Goldman of BMS's and Ocwen's purpose for requesting the discussion; *i.e.*, to address whether the recent increase in SLARS interest rates reflected an impairment of the securities' credit quality, increase in credit risk, and/or decrease in liquidity for the purpose of determining whether BMS and Ocwen should liquidate their SLARS holdings, retain their current holdings but not purchase additional SLARS, or continue to invest in those instruments.

45.     In response to Rinehart's direct inquiries, Goldman's participants on the October Call expressly represented to BMS and Ocwen that the SLARS's higher interest rates were being set by the competitive auction bidding process and were not indicative of anything other than the

supply of, and demand for, those securities.  In response to Rinehart's inquires as to whether there had been any impairment of SLARS credit quality, Goldman reassured BMS and Ocwen that because SLARS were, as always, safe, AAA-rated instruments, the market for these securities was continuing to operate normally.

46.    Rinehart also inquired as to whether the increase in SLARS interest rates reflected a decrease in the liquidity of those securities and, accordingly, an increase in the risk that BMS and Ocwen could end up holding potentially hundreds of millions of dollars in illiquid securities. In response, Goldman's participants represented that demand for the SLARS remained strong, the market for those instruments was, as always, highly liquid, and the auctions were entirely reliable.  Further, Goldman once again reassured BMS and Ocwen that -- as Goldman had always done in the past -- Goldman would continue to purchase at par value any SLARS for which there were insufficient independent third-party bids to ensure liquidity and the smooth operation of the auctions.  Goldman punctuated this representation by stating yet again that Goldman had had only a single failed SLARS auction in its entire fifteen year history of making a market for those securities and that even in that instance investors had recovered the value of their holdings.

47.    At the time of the October Call, Goldman knew or consciously and recklessly disregarded, that its statements to BMS and Ocwen were untrue and omitted material facts necessary in order to make those statements not misleading.

48.    Goldman knew or consciously and recklessly disregarded that its representations to BMS and Ocwen during the October Call that the SLARS's elevated interest rates were a

result of competitive bidding in the auction market, and that there had been no deterioration in liquidity or safety for those instruments, were false.

49.     As Goldman knew or consciously and recklessly disregarded, and concealed from BMS and Ocwen at the time of the October Call: genuine demand for SLARS had plummeted resulting in a substantial imbalance with the supply of instruments being offered for sale; liquidity in those markets had deteriorated dramatically; brokers had purchased ever increasing amounts of those securities to conceal the lack of liquidity in those markets; the brokers themselves had created artificially high interest rates by submitting inflated bids for their own accounts in an effort to make SLARS more attractive to genuine, third-party investors; and the SLARS market would collapse entirely without the brokers' continuing and ever-increasing purchases.

50.     Further, as Goldman knew or consciously and recklessly disregarded, and concealed from BMS and Ocwen at the time of the October Call:  the higher interest rates the issuers were paying could impact the risk profile of the SLARS, including the risk of issuer default; the higher interest rates being paid by the SLARS issuers were in excess of the maximum rates on which the rating agencies had based their AAA ratings for the securities; and, accordingly, the underwriters, including Goldman, had been required to have the issuers obtain waivers from the rating agencies to avoid a cut in the AAA ratings Goldman had cited to BMS and Ocwen as evidence of the instruments' continuing high credit quality.

51.     Finally, Goldman knew or consciously and recklessly disregarded that its representations to BMS and Ocwen during the October Call that Goldman would continue to ensure liquidity for SLARS by purchasing at par value securities for which there were

insufficient bids thereby preventing failed auctions were false. At the time of the October Call, Goldman and other brokers were contemplating ending their decades old practice of making a market for the ARS they managed by buying for their own inventories SLARS for which there was insufficient third-party demand. At the time of the October Call, Goldman and the other brokers knew that ending this practice would cause a collapse of the markets for all ARS, including SLARS.

52.     In reliance on Goldman's representations and concealments, including Goldman's statements to BMS and Ocwen that Goldman would continue to ensure the liquidity of the SLARS it sold by purchasing at par value any securities for which there were insufficient bids at auction, BMS and Ocwen did not liquidate their SLARS positions. Further, in reliance on Goldman's representations and concealments, Ocwen purchased, for itself and BMS, an additional $1.5 billion of SLARS from Goldman.

**E.    Goldman's Misconduct
       Has Injured BMS And Ocwen**

53.     Between August 2007 and February 2008, Goldman and other brokers concealed from investors, including BMS and Ocwen, the initial collapse of the market for CDO-related ARS, as well as the rapid disappearance of demand for all other types of ARS, including SLARS. However, on February 13, 2008, after months of secretly contemplating a full retreat from the ARS market, Goldman -- without warning, and contrary to its express representations to BMS and Ocwen -- joined with other ARS brokers in ending their decades old practice of buying at par value SLARS and other ARS for which there was not sufficient investor demand to avoid bringing those illiquid assets onto their already overloaded balance sheets. Goldman and the other brokers knew that the withdrawal of their support would cause the entire ARS market to

collapse -- which is exactly what happened -- leaving tens of thousands of investors stranded with some $330 billion in illiquid, long term securities, including more than $236 million of SLARS Goldman had sold to BMS and Ocwen based on its deliberate misrepresentations.

54.     In June 2008, Ocwen found itself needing to sell at least a portion of the illiquid SLARS it held to satisfy certain business requirements.  Goldman, knowing of Ocwen's need to liquidate SLARS refused to repurchase at par value any of the instruments it had sold to Ocwen. Rather, Goldman sought a significant discount in return for paying cash for the SLARS.  Lacking alternatives, Ocwen, in June 2008, acquiesced to Goldman's terms and sold to Goldman SLARS with an aggregate face value of approximately $26 million at a 5 ½ percent discount, giving Goldman a nearly two and a half million dollar boon at Ocwen's expense.

55.     In addition to the improper discount that Goldman extracted from Ocwen, Goldman's misrepresentations and concealments have left BMS and Ocwen holding illiquid SLARS with an aggregate value in excess of $211 million which can now be sold only at a material discount.  Moreover, although Goldman had had the issuers obtain waivers from the rating agencies to enable Goldman to inflate the SLARS interest rates without causing a downgrade of the securities' essential AAA ratings, those waivers were temporary and the agencies have since, in many instances, slashed ratings on the SLARS Goldman sold to BMS and Ocwen.  Such ratings downgrades, which indicate an increased risk of default, have further impaired the value and marketability of the securities.  As Goldman knew, or consciously and recklessly disregarded, the securities' loss of liquidity, value and marketability would -- and now has -- caused substantial injury to both BMS and Ocwen.

56.     Among other things, BMS's and Ocwen's inability to access the cash now trapped in the Goldman SLARS has compelled both companies to engage in costly restructurings of their Investment Lines that, while enabling them to continue operations, has materially restricted the companies' earnings.  In addition, the loss of liquidity and costly restructuring have derailed BMS's plans to conduct an initial public offering of company shares and other potential strategic transactions.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

(For Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 Promulgated Thereunder)

57.     BMS and Ocwen incorporate by reference the allegations set forth in paragraphs 1 through 56, inclusive, of this complaint as though set forth fully herein.

58.     Goldman intentionally and/or recklessly:  (a) employed a device, scheme and artifice to defraud BMS and Ocwen with respect to the sale of the SLARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices or courses of business which operated as a fraud and deceit upon BMS and Ocwen in connection with the sale and purchase of the SLARS, in violation of Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated thereunder.

59.     Goldman also engaged in a series of fraudulent and deceitful acts or practices, including knowingly:  (a) making false statements about the liquidity of SLARS; (b) making false statements about the cause of the increase in the interest rate SLARS were paying; (c) making false statements about Goldman's continuing commitment to make a market in

SLARS by purchasing at par value SLARS for which there were insufficient third-party buyers; (d) failing to disclose that there had been a substantial decrease in third-party demand for SLARS resulting in a substantial imbalance with the supply of instruments being offered for sale; (e) failing to disclose that Goldman and other brokers had dramatically increased purchases of SLARS for their own accounts to conceal a decrease in third-party demand; (f) failing to disclose that the increase in the interest rate SLARS were paying was caused by Goldman's and other brokers' submitting inflated bids for the purpose of driving up interest rates to induce third-parties to buy the securities, (g) failing to disclose the impact of the increased interest rates on the SLARS risk profile, (h) failing to disclose that Goldman and the other SLARS underwriters had had the issuers secure special temporary waivers from the rating agencies to avoid downgrades to the essential AAA ratings conferred on SLARS as a result of the inflated interest rates, and (i) failing to disclose that Goldman and other brokers were contemplating ending their practice of purchasing at par value SLARS for which there was no third-party demand, which would cause the market to collapse rendering all SLARS illiquid.

60.     As Goldman intended, BMS and Ocwen reasonably relied upon the representations of Goldman in deciding not to liquidate their holdings of SLARS in October 2007, and to continue purchasing SLARS for their accounts.  Had BMS and Ocwen known that the information they received from Goldman contained material misrepresentations, or had they known the material adverse information that Goldman had concealed from BMS and Ocwen, BMS and Ocwen would have liquidated their SLARS holdings in October 2007 -- four months before the SLARS market collapsed -- and would not have purchased SLARS after that time.

61.     By reason of the foregoing, BMS and Ocwen have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(BMS's Claim for Violations of California's Blue Sky Laws)

62.     BMS incorporates by reference the allegations set forth in paragraphs 1 through 61, inclusive, of this complaint as though set forth fully herein.

63.     Goldman, directly or indirectly, sold to and offered to buy from BMS securities in the State of California by means of written and oral communications which included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of § 25401 of the Cal. Corp. Code.

64.     BMS reasonably relied upon the representations of Goldman in deciding not to sell its holdings of SLARS in October 2007, and to continue purchasing SLARS for its accounts thereafter.  Had BMS known that the information it received from Goldman contained material misrepresentations, or had it known the material adverse information that Goldman had concealed, BMS would have liquidated its SLARS holdings in October 2007 -- four months before the SLARS market collapsed -- and would not have purchased SLARS after that time.

65.     By reason of the foregoing, BMS has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

(Ocwen's Claim for Violations of Florida's Blue Sky Laws)

66.     Ocwen incorporates by reference the allegations set forth in paragraphs 1 through 65, inclusive, of this complaint as though set forth fully herein.

67.     Goldman, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, and a course of business which operated as a fraud or deceit upon Ocwen in connection with the offer, sale and purchase of SLARS in violation of § 517.301(a) of Fla. Stat.

68.     Ocwen reasonably relied upon the representations of Goldman in deciding not to sell its holdings of SLARS in October 2007, and to continue purchasing SLARS for its accounts thereafter.  Had Ocwen known that the information it received from Goldman contained material misrepresentations, or had it known the material adverse information that Goldman had concealed from Ocwen, Ocwen would have liquidated its SLARS holdings in October 2007 -- four months before the SLARS market collapsed -- and would not have purchased SLARS after that time.

69.     By reason of the foregoing, Ocwen has been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

(Common Law Fraud)

70.     BMS and Ocwen incorporate by reference the allegations set forth in paragraphs 1 through 69, inclusive, of this complaint as though set forth fully herein.

71.     With the intent of inducing BMS and Ocwen to: retain SLARS purchased from Goldman to avoid returning those SLARS to Goldman's burgeoning inventory; and continue purchasing SLARS from Goldman, Goldman knowingly and/or recklessly made and participated

in the making of material misrepresentations of fact and the omission of material facts to BMS and Ocwen, as set forth above.

72.    The fraudulent representations made by Goldman to BMS and Ocwen in October 2007 included, among others, that (a) SLARS remained highly liquid; (b) there had been no change to the securities' high credit quality as evidenced by the rating agencies continuing application of AAA ratings to SLARS; (c) the increase in SLARS interest rate was attributable to third-party bids being placed in the auctions; and (d) Goldman would continue to make a market in SLARS by purchasing at par value SLARS for which there were insufficient third-party buyers.

73.    Goldman's fraudulent omissions included its failure to disclose to BMS and Ocwen, among other things, that:  (a) there had been a substantial decrease in third-party demand for SLARS; (b) Goldman and other brokers had increased purchases of SLARS for their own accounts to conceal the decrease in third-party demand; (c) the elevated interest rates SLARS were paying was caused by Goldman's and other brokers' submitting inflated bids for the purpose of driving up interest rates to induce third-parties to buy the securities; (d) the inflated interest rates materially impacted the securities' risk profile; (e) Goldman and other underwriters had had the issuers obtain temporary waivers from the rating agencies to avoid downgrades to the AAA ratings conferred on the SLARS; and (f) Goldman and other brokers were contemplating ending their practice of purchasing at par value SLARS for which there was insufficient third-party demand, which would cause the market to collapse rendering all SLARS illiquid.

74.     In justifiable reliance upon Goldman's misrepresentations and omissions, and without knowledge of the truth, BMS and Ocwen reasonably relied upon the representations of Goldman in deciding not to sell their holdings of SLARS in October 2007, and to continue purchasing SLARS for their accounts thereafter.  Had BMS and Ocwen known that the information they received from Goldman contained material misrepresentations, or had they known the material adverse information that Goldman had concealed from BMS and Ocwen, BMS and Ocwen would have liquidated their SLARS holdings in October 2007 -- four months before the SLARS market collapsed -- and would not have purchased SLARS after that time.

75.     By reason of the foregoing, BMS and Ocwen have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Promissory Estoppel)

76.     BMS and Ocwen incorporate by reference the allegations set forth in paragraphs 1 through 75, inclusive, of this complaint as though set forth fully herein.

77.     Goldman made promises to BMS and Ocwen, which included, among others: (a) the SLARS Goldman sold to BMS and Ocwen were safe and liquid; and (b) Goldman would ensure liquidity for the SLARS it sold to BMS and Ocwen by purchasing at par value any such SLARS BMS and Ocwen sought to sell in the event there were insufficient third-party buyers for those securities.

78.     BMS and Ocwen reasonably relied upon the promises made by Goldman in deciding not to sell their holdings of SLARS in October 2007, and to continue purchasing additional SLARS for their accounts thereafter.  Had BMS and Ocwen known that Goldman

would not honor its promises, BMS and Ocwen would have liquidated their SLARS holdings in October 2007 -- four months before the SLARS market collapsed -- and would not have purchased SLARS after that time.

79.    By reason of the foregoing, BMS and Ocwen have been damaged in an amount to be determined at trial.

WHEREFORE, BMS and Ocwen demand judgment:

     (a)    on the First, Fourth and Fifth Causes of Action, awarding BMS and Ocwen compensatory damages as against Goldman in an amount to be determined at trial;

     (b)    on the Second Cause of Action, awarding BMS compensatory damages as against Goldman in an amount to be determined at trial;

     (c)    on the Third Cause of Action, awarding Ocwen compensatory damages as against Goldman in an amount to be determined at trial;

     (d)    on the Fourth Cause of Action, awarding BMS and Ocwen punitive and exemplary damages as against Goldman in amounts to be determined at trial;

     (e)    awarding BMS and Ocwen the costs and disbursements of this action, including reasonable attorneys' fees; and

     (f)    such other and further relief as is just and proper.

## JURY DEMAND

BMS and Ocwen hereby demand a trial by jury of all issues triable to a jury.

Dated: New York, New York
October 1, 2008

Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By:_____
    Eric J. Wallach
    Michael M. Fay
    Charles M. Miller

1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiffs*
*Bankruptcy Management Solutions, Inc. and*
*Ocwen Financial Corporation*